UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| ANGIE L. LUCKETT, | : | Case No. 3:16-cv-401 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | Magistrate Judge Sharon L. Ovington |
| | : | (by full consent of the parties) |
| NANCY A. BERRYHILL, COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# DECISION AND ENTRY

## I. Introduction

Plaintiff Angie L. Luckett brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. She applied for benefits on October 7, 2013, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Eric Anschuetz concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #6), the Commissioner's Memorandum in Opposition (Doc. #10), and the administrative record (Doc. #4).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Anschuetz's non-disability decision.

## II. Background

Plaintiff asserts that she has been under a "disability" since January 18, 2011. She was forty-six years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). She has a high school education. *See id.* § 404.1564(b)(4).

### A. Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Anschuetz that she cannot work because of pain, cuts, and infections. (Doc. #4, *PageID* #114). Plaintiff gets cuts all over her hands. *Id.* at 116, 127. Sometimes it is because she is using her hands too much or because her skin is really thin and it tears; other times, she does not know the cause or even that it is going to happen. *Id.* at 115-16. She explained, "I think the worst thing is it's unpredictable. You might plan something, and then it starts. You're not going to be able to do whatever it is, because it's … like, it takes over your whole life, you know?" *Id.* at 129.

She had her last "flare up" two weeks before the hearing. *Id.* at 126. By the time of the hearing, the fissures/cuts had closed but she had spots on them and her skin was very thin. *Id.* at 127. When the cuts begin to heal, if she bends her hand, they crack back open. *Id.* at 130-31. "So, it's best just to tape it up and … you have to wait it out …." *Id.* at 131.

Plaintiff wears gloves all the time. *Id.* at 117. She wears compression gloves and gloves made of all cotton. *Id.* She has to wear gloves without fingertips because otherwise the middle of her hand gets really dry and infected. *Id.* at 134. She believes her hands need to be able to breathe. *Id.*

Plaintiff takes several medications including Tramadol, Advil, Clobetasol, and Claritin. *Id.* at 119. She also takes Prednisone and Methylprednisolone but can only do so for short periods of time. *Id.* at 119-20. Plaintiff has a prescription for cortisone cream but also uses an over-the-counter cream. *Id.* at 120, 131. She has used hydrocortisone cream, Fluconazole, Triamcinolone, and Protopic. *Id.* at 132. She uses different ones depending on her symptoms. *Id.* She explained, "it's a chain of reactions. One day you can do this. The next day you -- that does not work for you. So, my counter is full of all different kinds of remedies and whatever, because what works for me today, it might not work for me tomorrow …." *Id.* at 114. Plaintiff also takes medication—currently, Claritin—for her allergies. *Id.* at 134.

The problems with Plaintiff's hands began around 2001. *Id.* at 112. She worked steadily until that time but then had to stop. *Id.* at 111. In 2003, Plaintiff went back to work but then did not work from 2004 to 2006. *Id.* at 113. She testified that she was sick or unable to work at that time. *Id.* During the periods of time when she felt better, she went to a temp agency and worked as much as she could. *Id.*

Plaintiff last worked as an intake representative at Community Blood Center in January 2012. *Id.* at 107-08. She set up appointments for people to donate blood. *Id.* at

108. She quit because, "my hands had gotten so bad that I couldn't keep up with the daily activities." *Id*.

Further, Plaintiff has inflammation and pain in her hands, joints, and feet. *Id.* at 115, 130. Dr. Mary John Thomas, a rheumatologist, diagnosed fibromyalgia. *Id.* at 118. However, Plaintiff never had "the 18-point fibromyalgia test[.]" *Id*.

Plaintiff has not had any mental health treatment but her primary-care physician prescribes medication that helps her sleep. *Id.* at 125. When asked why she needed it, she explained, "it was … everything just came at me at one time, you know? And it's just a little bit too much, you know, sometimes. … [I]t helped me sleep, and it just relaxed me to -- so I didn't have to worry a lot." *Id*.

Plaintiff lives in a house with her husband. *Id.* at 103-04. She has a driver's license and usually drives about three days a month. *Id.* at 104. On an average day, she generally gets up before eight o'clock and does her personal care. *Id.* at 122. Then, she might wash dishes. *Id*. To wash dishes, she has to put on cotton gloves with plastic gloves over them. *Id*. When she wears two pairs of gloves, her hands sometimes sweat, then start to itch. *Id*. She then determines what to do next depending on how her hands are feeling. *Id.* at 122-23. She is sometimes able to cook. *Id.* at 123. And, she can do laundry if she has gloves on. *Id*. Besides those activities, she watches TV. *Id*.

    **B.**    **Medical Opinions**

        **i.**    **Kathryn Balazs, D.O.**

Plaintiff's treating dermatologist, Dr. Balazs, completed an evaluation on September 15, 2014. *Id.* at 521-28. She reported that she began treating Plaintiff on

January 16, 2012.  *Id.* at 522.  She diagnosed atopic dermatitis, exfoliative dermatitis, and allergic contact dermatitis.  *Id*.  Dr. Balazs indicated that the skin on Plaintiff's scalp, face, neck, chest, and hands have lesions that have been present for at least three months.  *Id.* at 522-24.  But, only the lesions on Plaintiff's hands cause functional loss.  *Id.* at 524.  Specifically, "When swollen [and] peeling/flared, [Plaintiff] is unable to use her hands.  They crack from the swelling … and are painful.  This may last several weeks each time.  She is very compliant but her disease is very challenging to control."  *Id*.  Plaintiff has tried several different medications, including topical steroids, oral steroids, barrier repair creams, intramuscular steroids, and antihistamines.  *Id.* at 526.  Plaintiff is compliant with—and the lesions respond to—treatment.  *Id*.

      Dr. Balazs also provided stark comments detailing her treatment of Plaintiff:

> I have seen lots [and] lots of Dermatitis in my 14 years as a practicing Dermatologist, and Ms. Luckett's case is one of the most severe.  She does everything I ask of her and she is <u>very</u> difficult to control regardless.  She is more than willing to see other specialists to see if they can help—like Rheumatology and Allergy[—]but so far her skin condition is NOT well controlled.  The frequency [and] severity of her outbreaks have lessened but she still gets swollen, inflamed skin on her hands, neck, face, [and] chest quite regularly.  I feel that it would be very difficult for her to work with her hands in a job that required reliable attendance.  She could work intermittently but her flares are not predictable [and] when they occur are severe [and] she would need to be off work.

*Id.* at 528 (emphasis in original).

### ii.    Bradley Lewis, M.D., & Malika Haque, M.D.

    Dr. Lewis reviewed Plaintiff's medical records on November 19, 2013.  *Id.* at 154-62. He found that Plaintiff has two severe impairments: dermatitis and fibromyalgia.  *Id.*

5

at 157.  Dr. Lewis opined that she could lift and/or carry twenty pounds occasionally and ten pounds frequently.  *Id.* at 158.  She could stand and/or walk for a total of six hours in an eight-hour workday and sit for six hours total.  *Id.*  Her ability to push and/or pull is limited in both upper extremities.  *Id.*  She can frequently handle, stoop, kneel, crouch, crawl, and climb ladders/ropes/ scaffolds.  *Id.* at 158-59.  She should avoid even moderate exposure to wetness.  *Id.* at 159.  Dr. Lewis concluded that Plaintiff is not under a disability.  *Id.* at 161.

On February 19, 2014, Dr. Haque reviewed Plaintiff's records and confirmed Dr. Lewis' assessment.  *Id.* at 164-74.

## III.  Standard of Review

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(E).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Anschuetz to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five

sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520.

He reached the following main conclusions:

> Step 1: Plaintiff engaged in substantial gainful activity between January 18, 2011 and January 31, 2012.
>
> Step 2: She has the severe impairments of dermatitis and myalgias.
>
> Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.
>
> Step 4: Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work … except: she can stand and/or walk up to 6 hours in an 8-hour workday and sit up to 6 hours in an 8-hour workday. She can use her hands occasionally for handling. Her ability to climb ramps and stairs is unlimited. She is able to frequently climb ladders, ropes, or scaffolds. She can frequently balance, stoop, kneel, crouch, and crawl. She must also avoid moderate exposure to wetness."
>
> Step 4: She is unable to perform any of her past relevant work.
>
> Step 5: She could perform a significant number of jobs that exist in the national economy.

(Doc. #4, *PageID* #s 78-88). These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 88.

**V.     Discussion**

Plaintiff contends that the ALJ "erred in failing to give controlling weight to the opinion of [Plaintiff's] treating physician[;] … in failing to properly assess [her] credibility[;] … [and] in failing to account for the entirety of the vocational expert's testimony." (Doc. #6, *PageID* #653). The Commissioner maintains that substantial

8

evidence supports ALJ's evaluation of the medical evidence, Plaintiff's credibility, and the vocational expert's testimony.

### A. Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id*. (quoting Soc. Sec. R. 96-2p,

1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id*. Substantial evidence must support the reasons provided by the ALJ. *Id*.

ALJ Anschuetz found that the opinions of Plaintiff's treating dermatologist, Dr. Balazs, could be separated into two groups: 2012 opinions and 2014 opinions. He observed that twice in 2012, Dr. Balazs opined that Plaintiff could return to work without restrictions. (Doc. #4, *PageID* #85). In the same year, Dr. Balazs stated, "if [Plaintiff] did experience a severe flare, she may have trouble working due to discomfort." *Id.* at 85. The ALJ noted, however, "in that same medical source statement, Dr. Balazs reported [Plaintiff's] impairment does *not* affect a major life activity … [and] does not prevent [Plaintiff] [from] performing essential functions of her job." *Id.* at 85-86.

The ALJ assigned these opinions from 2012 "great weight" for a couple reasons. *Id.* at 86. He correctly observed that Dr. Balazs is Plaintiff's treating physician. And, he found her opinions to be generally consistent with Plaintiff's treatment records. More specifically, she "acknowledged [Plaintiff's] skin problems, but Dr. Balazs did not report [Plaintiff] was precluded from work because of them [and noted] … [Plaintiff] had only 'discomfort' even during a severe flare-up." *Id.* The ALJ concluded, "the fact that Dr. Balazs concluded that [Plaintiff] could return to work without any limitations twice in 2012 supports a finding that [Plaintiff] did not have a functional impairment that prevented her from working for a 12 month period prior to January 2013." *Id.*

In 2014, according to the ALJ, Dr. Balazs opined Plaintiff was more limited by her condition. *Id.* "Specifically, in September 2014, she reported that [Plaintiff] 'was unable

10

to use her hands when they became swollen, which could last for weeks.' Nevertheless, she also stated [Plaintiff] could work intermittingly, although [Plaintiff's] flares are not predictable, and when they occur, [Plaintiff] may have to be off work." *Id.* (citations omitted). He assigned these more recent opinions "some weight," finding:

> [T]hese opinions do not account for the fact that [Plaintiff] has failed, on many occasions, to follow prescribed treatments or to follow-up with specialists in order to prevent these flare-ups from occurring. In fact, the record suggests that [Plaintiff] continually exposed herself to food and aeroallergens despite having the knowledge that she was allergic to them and she would have some sort of reaction as a result. I cannot give great weight to Dr. Balazs' conclusion that [Plaintiff's] impairments prevent [Plaintiff] from working when [Plaintiff] knowingly exposes herself to the very factors that cause her symptoms to become so limiting.

*Id.*

ALJ Anschuetz does not refer to the treating physician rule—or either of its conditions—in his evaluation of either set of opinions and, instead, jumps straight to the factors. The Commissioner makes the same mistake, asserting without previous mention of the treating physician rule, "The regulations dictate that an ALJ evaluate a treating source opinion using specific factors of: (1) the treatment relationship …; (2) supportability …; (3) consistency with the record as a whole; (4) area of specialization of the source; and (5) 'other factors' …." (Doc. #10, *PageID* #675) (citing 20 C.F.R. § 404.1528(c)). This constitutes error: "these factors are properly applied only after the ALJ has determined that a treating-source opinion will not be given controlling weight." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). Further, this approach to weighing the treating physician's opinion erroneously ignores the hierarchy established

11

by the Regulations and fails to give any deference to the treating physician's opinions. *See* 20 C.F.R. § 404.1527(c)(2) ("[W]e give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations …."). And, because ALJ Anschuetz did not address the treating physician rule, the Court cannot engage in a meaningful review of whether he properly applied it to Dr. Balazs' opinion. *Gayheart,* 710 F.3d at 377.

The ALJ's discussion of the factors is too limited. He does acknowledge that Dr. Balazs is one of Plaintiff's treating physicians. He, however, does not recognize the length of their relationship or frequency of exam. Dr. Balazs treated Plaintiff consistently from January 16, 2012 until December 20, 2012 and from October 8, 2013 until, at least, April 2, 2015. (Doc. #4, *PageID* #s 467-520, 612-48); *see* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). The ALJ also overlooked—or ignored—the nature and extent of their treatment relationship. For example, Dr. Balazs sent biopsies of Plaintiff's skin to Dermatopathology Laboratory of Central States for several tests, including a cutaneous immunofluorescence test; referred Plaintiff to Dr. Gary D. Palmer for UV light treatment; and referred her to Dr. Shobha R. Wani, a rheumatologist, for treatment of pain. (Doc. #4, *PageID* #s 468, 513-14, 586-93); *see* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the

12

more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.").

The ALJ specifically addresses the consistency of Dr. Balazs' 2012 opinions, finding that they are consistent with Plaintiff's treatment notes, and in a roundabout way, he finds Dr. Balazs' 2014 opinions are not consistent with Plaintiff's actions. (Doc. #4, *PageID* #86); *see* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Substantial evidence, however, does not support these findings. The ALJ's summary—or interpretation—of Dr. Balazs' opinions and treatment notes is, at the very least, incomplete. Dr. Balazs' opinions, particularly when read in the context of her treatment notes, paint a much different picture of Plaintiff's impairments than what was drawn by the ALJ. Although the ALJ is correct that Dr. Balazs indicated Plaintiff could return to work twice in 2012, the notes reveal that there were significant periods of time Plaintiff was unable to return to work. For example, on January 27, 2012, a certified nurse practitioner from Dr. Balazs' office, Virginia Gullen completed a FMLA Medical Certification. (Doc. #4, *PageID* #s 511-12). She indicated that their office began treating Plaintiff for "significant facial swelling [and] edema [in her] periorbital areas [and] severely dry, fissured skin [on her] hands" on January 16, 2012, and she would be "incapacitated" until March 1, 2012. *Id.* After this, the treatment notes are slightly

13

puzzling. For example, a treatment note from May 21, 2012 indicated, "[Plaintiff] was supposed to go back to work today -- she can't because her hands are really flaring." *Id.* at 497. However, it is unclear when she became unable to work. Then, on June 7, 2012, Dr. Balazs opined, "[Plaintiff] can return to work on June 25, 2012. There are no restrictions as long as she is not experiencing a flare."[1] *Id.* at 491. It is not clear, however, if Plaintiff did return to work on June 25, 2012 because on July 17, 2012, Dr. Balazs noted on a prescription form, "Her severe eczema is ongoing but it is progressing with our treatment. Dr. Balazs will evaluate the situation at August appointment and decide if [Plaintiff] should return to work." *Id.* at 486. On August 7, 2012, Dr. Balazs indicated Plaintiff could return to work on August 14, and on August 10, Plaintiff "may extend time off work" until August 27 to give her "more time for [her] hands to clear." *Id.* at 487. And then, as the ALJ mentioned, on December 12, 2012, Dr. Balazs opined that Plaintiff "is cleared to return to work. Her condition is resolved." *Id.* at 475. Together, these notes show a distinct pattern of Plaintiff's condition interfering with her ability to work—a pattern ALJ Anschuetz did not address.

Then, in January 2013, Plaintiff stops treatment with Dr. Balazs and begins with Dr. Bane. It is from Dr. Bane's treatment notes that ALJ Anschuetz finds evidence of Plaintiff failing to follow prescribed treatment and "knowingly expos[ing] herself to the very factors that cause her symptoms to become so limiting." *Id.* at 86, 358-59, 434-53, 541-65. Under Social Security Ruling 82-59, "Where the treating source has prescribed

---

[1] The ALJ summarized this statement as, "Dr. Balazs concluded on June 25, 2012, [Plaintiff] could return to work without any restriction." (Doc. #4, *PageID* #85).

14

treatment …, but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant … is justifiably failing to undergo the treatment prescribed." 1982 WL 31384, at *2 (Soc. Sec. Admin. 1982). This development includes giving the claimant the "opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal." *Id.* Specifically, the claimant should be asked "whether they understand the nature of the treatment and the probable course of the medical condition (prognosis) with and without the treatment prescribed." *Id.* And, the claimant "should be made aware that the information supplied will be used in deciding the disability claim and that, because of the requirements of the law, continued failure to follow prescribed treatment without good reason can result in denial or termination of benefits." *Id.* The development further extends to the treating physician: "After documenting the claimant's … statements concerning the refusal of treatment, it may be necessary to recontact the treating source to substantiate or clarify what the individual was told." *Id.* at *3. In the present case, the ALJ did not ask the required detailed questions and did not notify Plaintiff that failure to follow prescribed treatment could result in the denial of benefits.

Nevertheless, the ALJ is correct to that extent that Dr. Bane's notes do contain numerous references to, for example, Plaintiff's failure to meet with a dietician, avoid known allergens, and/or use medication as prescribed. (Doc. #4, *PageID* #s 437, 447, 553, 556). However, Dr. Bane's notes also show that Plaintiff reported "working with both Dr. Schatzel and Dr. Debrosse to help find a diet plan that prevents her from

15

flaring." *Id.* at 560. Dr. Bane also observes that Plaintiff is "allergic to innumerable foods as well as aeroallergens [and] …[s]he finds it very difficult to avoid all of [them] *despite diligence on her part*." *Id.* at 449 (emphasis added).

Plaintiff then returned to treatment with Dr. Balazs in October 2013. *Id.* at 472. Notably, the ALJ points to only one note of Dr. Balazs' indicating Plaintiff failed to follow prescribed treatment: "Even as late as December 2014, [Plaintiff's] dermatologist was reporting that [Plaintiff] had a rash on her forearms and neck but that she was not using the ointment prescribed for the rash because she was afraid of it." *Id.* at 85 (citing Ex. 12F/4 [*PageID* #615]). The ALJ is correct. But, a review of all of the treatment notes reveals that in June 2014, Plaintiff called because she was concerned about using Clobetasol because it "broke down [the] skin on [her] hands and burned." *Id.* at 643. She similarly reported to Dr. Bane that it "'tears down her hands' after 2 weeks of use." *Id.* at 553. Significantly, the ALJ fails to address that Dr. Balazs specifically stated in her opinion that Plaintiff "does everything I ask of her and she is <u>very</u> difficult to control regardless. She is more than willing to see other specialists to see if they can help—like Rheumatology and Allergy[—]but so far her skin condition is NOT well controlled." *Id.* at 528. The ALJ's selective reading of the record constitutes error. "[A] substantiality of evidence evaluation does not permit a selective reading of the record. 'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part,

16

*Garner v. Heckler,* 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted)).

Thus, the reasons provided by ALJ Anschuetz do not constitute "good reasons" for discounting Dr. Balazs' opinions. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley,* 581 F.3d at 407 (quoting *Rogers,* 486 F.3d at 243); *see* Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion ….").

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[2]

### B. Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's

---

[2] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether she was under a disability and whether her application for Disability Insurance Benefits should be granted.

**IT IS THEREFORE ORDERED THAT**:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Angie L. Luckett was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.

Date: August 29, 2017

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge